## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CHRISTOPHER C. ALEXANDER,

     Plaintiff,

v.                                                                        Case No: 8:18-cv-639-CEH-JSS

DIANA HEATHER HEATH and
HOLIDAY SURGERY CENTER LLP,

     Defendants.

_____/

## **O R D E R**

     This matter comes before the Court on Defendants' Motion to Dismiss (Doc. 42). In the motion, Defendants request the Court dismiss with prejudice Relator's Second Amended Complaint for failure to state a claim.   Relator responded in opposition (Doc. 49), and Defendants replied (Doc. 53). The Court, having considered the motion and being fully advised in the premises, will grant Defendants' Motion to Dismiss and grant Relator leave to file a Third Amended Complaint.

## I.    **BACKGROUND**[1]

     Relator, Christopher Alexander, ("Relator" or "Alexander") sues Defendants, Diana Heather Heath and Holiday Surgery Center LLP, for False Claims Act ("FCA") violations under 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G); FCA retaliation, and similar

---

[1] The following statement of facts is derived from the Second Amended Complaint (Doc. 31), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

statutory violations under Florida law. Relator is a certified ophthalmic technician ("COT") and surgical scrub tech who resides in Spring Hill Florida. Doc. 31 ¶ 6. Relator was employed by Lazenby Eye Center from January 2004 to January 10, 2018. *Id.* ¶ 7. Holiday Surgery Center, d/b/a Lazenby Eye Center ("Lazenby") is a vision and eye surgery center owned by Defendant, Dr. Diana Heather Heath ("Defendant" or "Dr. Heath"). *Id.* ¶ 9. Lazenby, a doctor's office performing complete medical eye exams, cataract surgery, blepharoplasty, diabetic eye exams, glaucoma treatment, and other eye treatments, has offices located in Holiday and Largo, Florida. *Id.* ¶¶ 9, 10.

The Pinellas County Health Program (PCHP), established in 2008 to provide accessible and affordable health care services, is a primary care program for residents of Pinellas County. *Id.* ¶ 23. The PCHP, funded as a federally qualified health center, provides medically necessary specialty health services including ophthalmologic services to its patients, such as complex cataract surgery, but not simple cataract surgery. *Id.* ¶¶ 24, 25, 26. Lazenby and Dr. Heath (collectively "Defendants") receive funds from PCHP for cataract surgeries. *Id.* ¶ 27.

Cataracts are an opacity or clouding of a person's natural lens, which may prevent a patient from seeing an image formed in the retina. *Id.* ¶ 31. Cataract surgery is a procedure to remove a person's natural lens of their eye and replace it with an artificial lens. *Id.* ¶ 32.

Relator worked for Defendants as a COT and surgical scrub technician. *Id.* ¶ 28. His duties included performing a patient's routine eye exam prior to the patient seeing Dr. Heath. *Id.* ¶ 29. As part of the routine eye exam, Relator would test a patient's

visual acuity, check intraocular pressure, and complete a refraction process. *Id.* ¶ 23. Relator alleges his job responsibilities included convincing and approving patients for cataract surgery or posterior capsule opacification surgery ("PCO"). *Id.* ¶ 30.

The process to approve a patient for cataract surgery includes a comprehensive visual examination and a Visual Acuity test. *Id.* ¶ 33. If a patient shows interest in cataract surgery, a Refraction Test,[2] Glare test, and a Potential Acuity Measurement ("PAM") test are performed in order to qualify the patient for medically necessary surgery. *Id.* ¶ 34. Relator alleges he was instructed by his superiors to assure that patients failed the refraction test in order to qualify them for cataract surgery that would be paid for by Medicare or Medicaid. *Id.* ¶¶ 35–36. If the patient's eyesight was able to improve to anything better than 20/50 minus 1 by using the Refraction test, then a patient would not qualify for surgery paid by Medicare or Medicaid, and a Glare test is then required to qualify a patient for cataract surgery. *Id.* ¶¶ 37, 38.

In order to conduct a Glare test, a Brightness Acuity Test ("BAT") machine is used to objectively provide measurements of functional Visual Acuity in three different light conditions. *Id.* ¶ 38. At Lazenby, a BAT was conducted using a machine by Marco Ophthalmic. *Id.* ¶ 39. Seven years ago, all three BAT machines used to conduct Glare tests at Lazenby were not working. *Id.* ¶ 41. Relator complained to his supervisor, Chris Wegener ("Wegener"), who instructed him to forgo the test but record that the patient failed the test. *Id.* ¶ 41. Relator alleges that when a Refraction

---

[2] A Refraction Test is used to determine the lens power needed to compensate for any refractive error such as nearsightedness, farsightedness, or astigmatism. Doc. 31 ¶ 35.

test and BAT test showed scores better than 20/50 minus 1, a BAT re-test would be conducted when the patient's eyes were dilated, which would always result in a failing score. *Id.* ¶ 46.

The PAM test is also used to qualify a patient for cataract surgery and is an indicator of whether surgery would be beneficial to a patient. *Id.* ¶ 42. Relator alleges that most of the patients would not show improvement with the surgery, but Dr. Heath would proceed with the surgery. *Id.* ¶ 43. In his fourteen years with Lazenby, Relator is unaware of anyone being denied cataract surgery. *Id.* ¶ 48.

Relator alleges he has first-hand knowledge of Defendants' unlawful practices of Dr. Heath performing cataract and PCO surgeries on patients with 20/20 vision who did not qualify for the surgery for purposes of being reimbursed by Medicare and Medicaid. *Id.* ¶ 49. About twenty-five percent of all surgeries were performed by Dr. Heath on patients with 20/20 vision. *Id.* ¶ 51. Dr. Heath conducted between 15 and 20 cataract and PCO surgeries per week. *Id.* All patients are billed for BAT tests, which are not performed. *Id.* Eighty-five to ninety percent of the surgeries are paid for by Medicare and Medicaid. *Id.*

After working for Lazenby for nearly four years, Relator noticed that a majority of his workups on patients were being re-examined by Wegener. *Id.* ¶ 52. When Relator asked Wegener about this, Wegener explained that Dr. Heath required all patients who wanted cataract or PCO surgery to be qualified by conducting a BAT test

with the patient's eyes dilated to ensure Medicare and Medicaid would cover the surgery. *Id.*

During his employment with Defendants, Relator witnessed Dr. Heath qualify both eyes for surgery when only one eye qualified and the other had perfect vision, *id.* ¶ 54; saw Wegener fail both eyes of a patient in order to procure Medicare and Medicaid insurance payments, *id.* ¶ 55; saw Dr. Heath perform lens replacement on patients knowing that the lens replacement would not improve the patient's vision, *id.* ¶ 57; and saw Defendants perform various fraudulent cataract and PCO surgeries on patients that had 20/20 vision, *id.* ¶ 59.

Lazenby has a contract with PCHP offering ophthalmology services to qualified indigent Pinellas County residents. *Id.* ¶ 60. Relator is aware that Dr. Heath provided simple cataract surgeries to PCHP patients and billed them as complex cataract surgeries because simple cataract surgeries are not otherwise covered. *Id.* ¶ 61. Relator witnessed Wegener falsifying BAT test results in order to qualify a patient for cataract surgery covered under PCHP. *Id.* ¶ 63. Relator is aware that almost all patients covered under PCHP received a fraudulent cataract surgery. *Id.* ¶ 64. All patients insured by PCHP were scheduled for cataract surgery unless they objected to the surgery. *Id.* ¶ 66. Relator is aware that Defendants were billing Medicare for BAT tests to PCHP patients when the BAT machines were inoperable. *Id.* ¶ 68.

When a patient shows any retina abnormality, a test is performed to check for Hypertensive Retinopathy, which occurs when a person's blood pressure is too high

causing the retina blood vessels to thicken. *Id.* ¶¶ 69, 71. Relator claims he was directed to test for Hypertensive Retinopathy in every patient with any type of elevated blood pressure, even slight. *Id.* ¶ 71. In 2014, Defendants purchased an optical coherence tomography ("OCT") machine to test for Hypertensive Retinopathy. *Id.* ¶ 72. Since the purchase of the machine, Defendants have conducted forty to sixty retina exams on this machine per week. *Id.* The costly testing is covered by Medicare, and most of the tests are unnecessary. *Id.* ¶ 73.

Relator also claims to have first-hand knowledge that Defendants code all minor procedures as microscopic procedures in order to bill at a higher rate to Medicaid and Medicare. *Id.* ¶ 74. While employed with Defendants, he only observed two microscopic procedures being performed, but states that all patient charts reflect minor procedures as being microscopic procedures. *Id.* ¶ 75. All minor procedures are conducted in the surgery center rather than in Dr. Heath's office in order to charge Medicare and Medicaid more due to a surgical center fee. *Id.* ¶ 77.

Although all follow-up appointments within ninety days of surgery are to be included in the cost of surgery, Defendants will code surgical follow-up appointments as unrelated eye problems to bill separately for the appointment. *Id.* ¶ 79.

Defendants continue to use paper charts, rather than an electronic medical record system. According to Relator, this is done to circumvent any type of Medicare or Medicaid audit of Defendants' charts and surgeries. *Id.* ¶¶ 80–83.

Relator alleges he became aware of Defendants' unlawful practices within a few months of working for Lazenby. *Id.* ¶ 84. He first noticed Wegener re-examine his tests and change patient's Refraction and BAT test results. *Id.* ¶ 85. After working for Lazenby for four years, Relator noticed a significant increase in patient files being re-checked by Wegener. *Id.* ¶ 86. According to Relator, Wegener explained this was done because Dr. Heath required all cataract and PCO surgical candidates to be given BAT tests with dilated eyes to ensure a failing result and guarantee Medicare or Medicaid coverage for the surgery. *Id.* Relator voiced his concern with Wegener that he did not feel comfortable with changing BAT test results or administering tests in such a fashion to guarantee a failing result solely for the purpose of qualifying the patient for Medicare or Medicaid coverage. *Id.* ¶ 87. Relator refused to conduct the BAT tests in that manner or change BAT test results, and Wegener continued to re-examine his patient files and change records. *Id.* ¶ 88. Relator noticed that over the course of his employment with Defendants that Dr. Heath went from performing four to eight surgeries to performing almost twenty per week, with the majority being covered by Medicare or Medicaid. *Id.* ¶ 89. Relator became more vocal in his opposition to Defendants' unlawful practice. *Id.* ¶ 90. Relator believes his opposition to the unlawful activities is what resulted in his termination in January 2018. *Id.* ¶ 93.

Relator sued Defendants on March 16, 2018. Doc. 1. On June 22, 2020, the United States declined to intervene in this *qui tam* action, and the Complaint was unsealed. Docs. 22, 26. On September 15, 2020, Relator filed a Second Amended

Complaint asserting six causes of action against Defendants. Doc. 31.  The instant motion followed.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are insufficient. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not enough. *Id.* A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint.  *Id.*

Additionally, Federal Rule of Civil Procedure 9(b) places more stringent pleading requirements on claims alleging fraud. Fed. R. Civ. P. 9(b). "[U]nder Rule 9(b) allegations of fraud must include facts as to time, place, and substance of the defendant's alleged fraud." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (citation and internal quotations omitted). Plaintiffs are thereby required to set forth "the details of the defendants' allegedly fraudulent

acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009) (internal quotation marks omitted) (citing *Clausen*, 290 F.3d at 1310). Failure to satisfy the particularity requirement under Rule 9(b) amounts to failure to state a claim under Rule 12(b)(6). *See, e.g., Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

## III.  DISCUSSION

### A. Presentation of False Claims – Count One

In Count One, Relator alleges Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting false or fraudulent claims for payment by Medicare or Medicaid. Relator alleges Defendants knowingly billed Medicare and Medicaid for fraudulent surgeries and testing, including cataract surgery, PCO surgery, glare testing using a BAT machine, hypertensive retinotherapy, and microscopic procedures, which were either not done or were unnecessary. Defendants are alleged to have omitted information or falsely represented material information to Medicare and Medicaid when they submitted claims for payment for surgeries performed on patients with perfect vision. Relator alleges Defendants provided false information to Medicare and Medicaid regarding Glare tests performed. Relator further alleges that Defendants' material misrepresentations were made to influence the government to pay for the procedures from Medicare and Medicaid. Relator asserts that Defendants knowingly or with deliberate or reckless indifference presented fraudulent claims to the government for payment from Medicare and Medicaid.

In this Circuit, to state a cause of action under § 3729(a)(1)(A), a relator must prove three elements:

> (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false.

*United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(A)). The "'*sine qua non* of a False Claims Act violation' is the submission of a false claim to the government." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quoting *Clausen*, 290 F.3d at 1311). To state a claim in an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). *See Clausen*, 290 F.3d at 1309. In pertinent part, Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud," but scienter may be alleged generally. To satisfy this heightened-pleading standard in an FCA action, the Relator must allege "facts as to time, place, and substance of the defendant's alleged fraud," particularly, "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1310 (quoting *Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 567–68 (11th Cir. 1994)) (internal quotation marks omitted).

"The [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1309 Thus, the primary inquiry regarding whether a relator's allegations state a claim under this subsection is, did the defendant present (or

10

caused to be presented) to the government a false or fraudulent claim for payment? *Hopper*, 588 F.3d at 1326. To satisfy Rule 9(b)'s heightened-pleading requirements, the Relator must allege the "actual presentment of a claim . . . with particularity," *id.* at 1327, meaning particular facts about "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," *Corsello*, 428 F.3d at 1014. Here, review of the Second Amended Complaint reveals that Relator wholly fails to allege particular facts as to the presentment of any claim to the federal government for payment.

While Relator generally references that all patients are billed for a BAT test which was not performed, that 85 to 90% of surgeries are paid for by Medicare or Medicaid, that simple surgeries were billed as complex surgeries, that Defendants billed for BAT tests to PCHP when the BAT machines were inoperable, that Defendants coded minor procedures as microscopic procedures to bill at a higher reimbursement rate, that minor procedures were scheduled at the surgery center to bill for the surgical center fee, that surgical follow-up visits were coded as non-surgery related eye problems in order to separately bill for the service, and that Dr. Heath went from performing four to eight surgeries to twenty per week, Relator fails to allege any detail regarding the presentment of a claim to the government for payment by Medicare or Medicaid. Failure to sufficiently plead that a claim was submitted justifies dismissal of a claim under § 3729(a)(1)(A). Specifically, Relator does not allege the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," *Corsello*, 428 F.3d at 1014; *see Clausen*, 290 F.3d at 1311 (amended complaint's failure to identify any specific claims that were submitted to the United

States or identify the dates on which those claims were presented to the government was a fatal flaw and that the second amended complaint's addition of conclusory statements regarding specified tests being submitted on the "date of service or within a few days thereafter," suffered from the same defect, *i.e.*, insufficient information about the actual submission of claims). In affirming the district court's dismissal of the relator's *qui tam* complaint, the appellate court in *Clausen* reasoned that "[i]f Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion." *Id.* at 1311, 1313. Relator's failure here to provide any specific factual allegations of the presentment of the allegedly fraudulent submissions to the government is fatal to his claim. *See Corsello*, 428 F.3d at 1014.

Relator argues that the Eleventh Circuit does not require exact billing data or a sample representative claim in order to satisfy Rule 9(b), but rather contends that the particularity requirement can be satisfied where a relator's conversations about billing practices and methods with an office manager can form the basis of a relator's *qui tam* claims. Doc. 49 at 8 (citing *United States ex rel. Walker v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005)). However, Relator's Second Amended Complaint is devoid of any specific allegations regarding billing practices and methods, amounts of charges submitted, dates that charges were submitted, specific claims presented to the government to be paid, payments made in response to the submitted claims, or copies of any bills or payment. Indeed, Relator does not identify a single claim that was presented for payment. Relator does not allege any first-hand

12

knowledge of the Defendants' billing practices or procedures. To allege fraudulent submissions, a relator generally must provide billing details, such as the dates and contents of submissions for payment and those employees submitting the bills for payments. While Rule 9(b)'s particularity requirement "does not mandate all of this information for [each] alleged claim[,] . . . some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).'" *Clausen*, 290 F.3d at 1312 n.21. Given Relator's failure to plead any specifics regarding presentment of the claims, he fails to satisfy the pleading requirements to assert a fraud claim. Therefore, Count One fails to state a claim for presentment under § 3729(a)(1)(A), and it is due to be dismissed. Defendants argue that since Relator lacks the personal knowledge or indicia of reliability to remedy his failure to allege with specificity the submission of a false claim to the government, the claim should be dismissed with prejudice. As discussed below, the Court will give Relator an opportunity to amend.

## B. False Record or Statement – Count Two

In Count Two, Relator sues Defendants for violation of § 3729(a)(1)(B).  To properly state a claim under this section, a relator must show that "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Lincare Holdings, Inc.*, 857 F.3d at 1154 (citing 31 U.S.C. § 3729(a)(1)(B)). For this provision, the FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Relator's theory of liability under section (1)(B) is that Defendants used false records or statements when they

submitted claims for payment to Medicaid, Medicare, and PCHP certifying that a Glare test was performed when it was not and certifying that patients qualified for cataract or PCO surgery when they had not.

Although Relator generally alleges that Defendants used false records and statements to qualify patients for the cataract and PCO surgeries, Relator's allegations again fall far short of satisfying Rule 9(b)'s particularity requirement. Relator fails to identify with specificity any false documentation that was utilized in connection with a request for payment by Medicare or Medicaid. Because Relator has not identified with particularity any false records or statements to support this claim,[3] the Court need not address whether the vaguely identified false statements were material to a false claim. Count II is due to be dismissed.

### C. Reverse False Claim – Count III

To establish a reverse false claim cause of action pursuant to 31 U.S.C. § 3729(a)(1)(G), "a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (citing 31 U.S.C. § 3729(a)(7); *United States v. Bourseau*, 531 F.3d 1159,

---

[3] The inadequacy of Relator's allegations is further highlighted by the fact that Count II potentially implicates two versions of the FCA, as discussed by Defendants in their response. *See* Doc. 42 at 16 n.8.

1164–70 (9th Cir. 2008)). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." *Medco Health Sols.*, 671 F.3d at 1222 (citation omitted).

Defendants contend the claim in Count III should be dismissed because Relator cites no facts to support it. The Court agrees. In *United States v. Lee Memorial Health System*, No. 2:14-cv-437-SPC-CM, 2019 WL 1061113 (M.D. Fla. Mar. 6, 2019), the court dismissed a reverse false claim on the basis that the amended complaint could not establish that Lee Health had an obligation to repay the Government. 2019 WL 1061113, at *7. The court reasoned that Lee Health only had an obligation to repay the government if Lee Health submitted and received payment for false claims and the relator there failed to demonstrate that Lee Health submitted and received payment for false claims. *Id.* Thus, the complaint in that case did not allege facts from which the court could conclude that the defendant was avoiding a payment obligation to the government. *See also United States ex rel. Childress v. Ocala Heart Inst., Inc.*, No. 5:13-cv-470-ACC-PRL, 2015 WL 13793109, at *6 (M.D. Fla. July 2, 2015) ("Relator simply makes legal conclusions that defendants violated § 31 U.S.C. § 3729(a)(1)(G), but provides no specific allegations to support his claim."); *United States v. Space Coast Med. Assocs.*, 94 F. Supp. 3d 1250, 1263–64 (M.D. Fla. 2015) (finding that § 3729(a)(1)(G) claims failed because the complaint did not plead either a false statement or knowledge on the part of defendants). Similarly, in the instant case, Relator fails to allege with particularity that Defendants submitted a false claim and that Defendants received

payment for the false claim. Thus, the obligation to repay a falsely paid claim is not triggered.

A different outcome was presented in *United States ex rel. Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 709 (M.D. Fla. 2017), where the court found that a reverse false claim was sufficiently alleged. In that case, the complaint alleged that "the 'concrete' obligation to repay under § 3729(b)(3) and § 3729(a)(1)(G) was triggered when the defendants knew they had received funds to which they were not entitled and retained the funds instead of returning them." *Id*. The court stated that "[t]hese allegations sufficiently set forth an 'obligation' within the meaning of § 3729(b)(3), specifically 'an established duty . . . arising from . . . the retention of any overpayment,' so as to state a cause of action for a reverse false claim." *Id.* (citations omitted). Notably, the court there also found that the complaint sufficiently alleged presentation of a false claim and use of false records or statements. *Id.* at 705–08.

As discussed above, Relator has not sufficiently alleged that Defendants either submitted a false claim for payment by a federal healthcare program or made a false statement or record in furtherance of such. Relator has not otherwise pleaded that Defendants have any payment obligation to the government or have made any false statement in order to avoid that obligation. As a result, Relator does not sufficiently plead a violation of 31 U.S.C. § 3729(a)(1)(G) in Count III.

### D. False Claim Retaliation – Count IV

"Section 3730(h) creates a cause of action for an employee . . . who 'is discharged, demoted, suspended, threatened, harassed, or in any other manner

discriminated against in the terms and condition of employment because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop [one] of more violations of [the FCA]." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 n.7 (11th Cir. 2018), *aff'd*, 139 S. Ct. 1507 (2019) (citing 31 U.S.C. § 3730(h)(1)). "In order to show retaliation under the [FCA], the plaintiff must show that [he] was 'discriminated against in the terms and conditions of his employment' for engaging in protected activity." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018) (quoting 31 U.S.C. § 3730(h)(1)). "To state a cause of action for retaliation under the FCA, a plaintiff must allege the following two elements: '(1) [the employee] engaged in lawful acts in furtherance of an FCA action or endeavored to prevent at least one violation of the FCA; and (2) [the employee] was, as a result, subjected to some form of discrimination in the terms and conditions of [his] employment.'" *United States v. Prometheus Lab'ys, Inc.*, No. 8:18-CV-2931-VMC-AAS, 2020 WL 6203527, at *7 (M.D. Fla. Oct. 22, 2020) (Covington, J.) (citations omitted).

A retaliation claim under this provision is not required to be pleaded with the specificity of Rule 9(b). *See U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (holding that retaliation claim in *qui tam* action did not depend on allegations of fraud). The allegations of relator's complaints of illegal activity, however, must "support a reasonable conclusion that the defendants were aware of the possibility of litigation under the [FCA]." *Id.* at 1304. The FCA prohibits retaliation against an employee who "put [his] employer on notice of possible [FCA]

litigation by making internal reports that alert the employer to fraudulent or illegal conduct," even if an FCA claim is never filed. *Id.* at 1304. "But, mere reporting of wrongdoing to supervisors, without alleging that the wrongdoing constitutes fraud on the government, does not qualify as protected conduct." *Ortino v. Sch. Bd. of Collier Cty.*, No. 2:14-CV-693-JES-CM, 2015 WL 1579460, at *2 (M.D. Fla. Apr. 9, 2015) (Steele, J.). A review of Relator's allegations indicates he inquired regarding Wegener's repeated re-examination of his files, he complained to his supervisor that he "did not feel comfortable" with certain policies of the Defendants, he "became more vocal in his opposition to the unlawful activity" during his last years at Lazenby, and he had conversations with Wegener prior to his termination in which Relator expressed worry about potential fraud.   Doc. 31 ¶¶ 86, 87, 90, 91. Additionally, he alleges he believed Defendants were violating the FCA and made numerous reports to Wegener and other Lazenby officials. *Id.* ¶ 119. However, such ambiguous statements fall short of putting his employer on notice that its conduct constituted fraud on the government and of possible FCA litigation.

Additionally, a claim of retaliation requires the plaintiff to establish "a causal connection between the retaliation and the protected activity; that is, [he] must show that the retaliation was because of the protected activity." *HPC Healthcare*, 723 F. App'x at 792 (quotations and citations omitted). Other than Relator's speculation that he "believes that his opposition to the unlawful activities resulted in his termination" (Doc. 31 ¶ 93), he fails to allege any ultimate facts to show a causal connection between

his complaints and his termination to support a claim of retaliation. Accordingly, dismissal of the retaliation claim is warranted.

### E. Florida False Claim Act – Count V

Relator's claim of violation of Florida's False Claims Act as alleged in Count V models the federal claims addressed above and requires proof of the same elements and the same heightened standard for pleading fraud. *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1272 (11th Cir. 2018) (noting that "Florida has enacted a parallel statutory scheme with similar provisions" to the False Claims Act, 31 U.S.C. § 3729 *et seq*.); *United States v. Sand Lake Cancer Ctr., P.A.*, No. 8:13-cv-2724-JDW-MAP, 2019 WL 423156, at *2 (M.D. Fla. Feb. 4, 2019) ("Relator's claims brought under Florida law require proof of the same elements."); *United States v. LifePath Hospice, Inc.*, No. 8:10-cv-1061-JSM-TGW, 2016 WL 5239863, at *8 (M.D. Fla. Sept. 22, 2016), *aff'd sub nom. United States v. HPC Healthcare, Inc.*, 723 F. App'x 783 (11th Cir. 2018) (reasoning that because "the statutes govern the same conduct, impose the same liability, grant relators the same stake in any potential recovery, and use nearly identical language in setting forth the elements of a violation . . . the standards under both the Florida Act and the Federal Act are the same") (citing *United States ex. rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007)). Having found that Relator has not sufficiently pleaded claims under the federal False Claims Act, and that the identical Florida False Claims Act violations are based on the same allegations as the federal claims, Count V also fails to satisfy Rule 9(b) and is due to be dismissed.

**F. Whistleblower Violation – Count VI**

Under Florida Statute § 448.102(3), an employer may not take retaliatory personnel action against an employee for objecting to or refusing to participate in any activity or practice of the employer that violates a law, rule or regulation. In order to state a cause of action under the Florida Whistleblower Act ("FWA"), a plaintiff must allege that: (1) he "engaged in statutorily protected expression;" (2) he "suffered a materially adverse action of the type that would dissuade a reasonable employee from engaging in statutorily protected activity;" and (3) "there was some causal link between these events." *Rutledge v. SunTrust Bank*, 262 F. App'x 956, 958 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).

As Defendants point out, a relator is required to show that he objected to conduct that actually violated a law. *See Pierre v. AIDS Healthcare Found., Inc.*, No. 19-62556-CIV-Singhal, 2020 WL 6381557, at *6 (S.D. Fla. Oct. 30, 2020) ("to establish the first element of her *prima facie* FWA case, [relator] must establish that she objected to conduct that actually violated a law, rule, or regulation"). Relator's allegations as to Defendants' violation of a law are vague and conclusory. *See, e.g.,* Doc. 31 ¶ 119 (alleging he believed that Defendants were violating the FCA). Moreover, to bring a cause of action based on a violation of the FWA, "the employee must notify the employer about the illegal activity, policy, or practice." *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 n.1 (11th Cir. 2013). Like Relator's retaliation claim discussed above, his allegations under the FWA fail to demonstrate that he put his employer on notice that its conduct constituted fraud on the government or that there is a causal

connection between his protected activity and his termination. Accordingly, Count VI is due to be dismissed.

### G. Leave to Amend

Defendants argue that dismissal of the Second Amended Complaint should be with prejudice as Relator has already amended his complaint twice and he lacks the personal knowledge or indicia of reliability to cure the deficiencies in his allegations.

"[A] district court's discretion to dismiss a complaint without leave to amend is 'severely restrict[ed]' by Fed. R. Civ. P. 15(a), which directs that leave to amend 'shall be freely given when justice so requires.'" *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (quoting *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981)). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Nothing on the record before the Court suggests undue delay, bad faith, or dilatory motive on the part of Relator, nor that Defendants will be unduly prejudiced if the Court allows Relator one more opportunity to amend the complaint. And while Relator has already amended his complaint twice, he did so voluntarily, with consent the second time (Doc. 30) and without the benefit of an order from the Court. There is no evidence of

21

repeated failure due to previously allowed amendments. Therefore, the Court will allow Relator a final opportunity to file a Third Amended Complaint.

For the reasons stated above, it is hereby

**ORDERED**:

1.     Defendants' Motion to Dismiss Relator's Second Amended Complaint (Doc. 42) is **GRANTED**, and Relator's Second Amended Complaint is **DISMISSED, without prejudice**.

2.     Relator is granted leave to file a Third Amended Complaint, consistent with this Order. The Third Amended Complaint shall be filed within fourteen (14) days of the date of this order. Failure to file a Third Amended Complaint within the time provided will result in dismissal of this action without further notice.

**DONE AND ORDERED** in Tampa, Florida on August 13, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties, if any